ORIGINAL

1  **JASON I. SER**
California State Bar Number 201816
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California 92101-5008
Telephone: (619) 234-8467
4  E-mail: jason_ser@fd.org

5  Attorneys for Mr. Crotte



FILED

MAY - 6 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY  KY  )         DEPUTY

6

7

8              UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10

11  ALDO OMAR CROTTE SAINEZ,        )   NO. '08 CV 0819 J AJB
                                    )
12              Petitioner,         )   Related Case No. 07MJ0177 (JMA)
                                    )
13          v.                      )   PETITION FOR WRIT OF
                                    )   HABEAS CORPUS
14  STEVE SAFFORD, Acting United States )
    Marshal for the Southern District of )
15  California, et al.              )
                                    )
16              Respondent.         )
                                    )
17  _____     )

18                          **I.**

19                    **INTRODUCTION**

20          ALDO OMAR CROTTE SAINEZ (hereinafter "Mr. Crotte") petitions this Honorable Court

21  for a writ of habeas corpus following an order by the Honorable Jan M. Adler, United States

22  Magistrate Judge, approving partial certification of him for extradition to Mexico by the Secretary

23  of State. See In the Matter of the Extradition of Aldo Omar Crotte Sainez, 2008 WL 366135, Case

24  No. 07MJ0177 (JMA), Order Granting in Part and Denying in Part Request for Extradition ("Partial

25  Certification Order") (February 8, 2008).   The order certifying extradition violates both the

26  Constitution of the United States as well as the treaty between Mexico and the United States. The

27  writ of habeas corpus should issue because Mr. Crotte is in United States Marshall custody in

28  violation of the extradition treaty between the United States and Mexico.



## II.

## JURISDICTION

A district court has jurisdiction over a petition for a writ of habeas corpus when a person is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c)(3). Review of an order certifying extradition is available by way of a petition for a writ of habeas corpus. Caplan v. Vokes, 649 F.2d 1336, 1340 (9th Cir. 1981). Venue is proper in this district as all proceedings (including execution of an arrest warrant and her arrest) have been held here and Mr. Crotte is currently in custody in the Southern District of California. See 28 U.S.C. § 2241, et. seq., and 28 U.S.C. § 1391(e).

## III.

## PETITION

1.       Mr. Crotte is currently in the custody of the United States. He is being detained at the Western Regional Detention Facility in downtown San Diego. He is in United States Marshall custody.

2.       Mr. Crotte is confined pursuant to an arrest warrant issued on January 24, 2008 and the Partial Certification Order certifying his extradition to the Secretary of State issued by the Honorable Jan M. Adler, United States Magistrate Judge for the Southern District of California. This order was filed on February 8, 2008.

3.       Mr. Crotte has not appealed the order certifying his extradition. There is no right to direct review of an order certifying extradition, and review is available only by way of a petition for a writ of habeas corpus. Caplan, 649 F.2d at 1340; see also Quinn v. Robinson, 783 F.2d 776, 786 n.3 (9th Cir. 1986).

4.       In its habeas review of the Magistrate Judge's extradition order, the District Court may only consider "whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate." Vo v. Benov, 447 F.3d 1235, 1240 (9th Cir. 2006) (quoting Mainero v. Gregg, 164 F.3d 1199, 1201-02 (9th Cir. 1999) and Quinn v. Robinson, 783 F.2d 776, 790 (9th Cir. 1986)).

5.     The grounds on which Mr. Crotte claims that he is being held unlawfully and the supporting facts are set forth in Section IV and V below.

6.     Mr. Crotte has not filed any previous petitions for a writ of habeas corpus or motions under 28 U.S.C. § 2255. Mr. Crotte has previously filed a motion for a stay of the order certifying his extradition to the Secretary of State. That stay was granted by Magistrate Judge Adler and remains in effect. A true and correct copy of the stay order is attached hereto as Exhibit J.

7.     A motion under 28 U.S.C. § 2255 is not an available remedy to Mr. Crotte. Review of an order certifying extradition is available only by way of a petition for a writ of habeas corpus. Caplan, 649 F.2d at 1340.

8.     Mr. Crotte is currently represented by Jason I. Ser through Federal Defenders of San Diego, Inc., pursuant to the appointment by the Honorable Jan M. Adler, United States Magistrate Judge, on March 12, 2007 in case number 07MJ0177 (JMA). Mr. Ser's address is 225 Broadway, Suite 900, San Diego, California 92101. Mr. Ser's telephone number is (619) 234-8467. Mr. Crotte has been represented by Mr. Ser throughout the course of the extradition proceedings.

9.     Mr. Crotte is not seeking leave to proceed in *forma pauperis*.

## IV.

## BACKGROUND IN SUPPORT OF PETITION

**A.     The Extradition Request and Its Bases.**

On January 24, 2007, the U.S. Attorneys Office filed a "Complaint For Extradition" (hereinafter, the "Extradition Complaint"), against Mr. Aldo Omar Crotte Sainez. See In re Sainez, 07MJ0177 (JMA), CR at 1.[1] The government filed the Extradition Complaint on behalf of the government of Mexico pursuant to an extradition treaty between Mexico and the United States (hereinafter the "Treaty"). See United States-Mexico Extradition Treaty, United States-Mexico, May 4, 1978, 31 U.S.T. 5059.[2] According to the Extradition Complaint Mr. Crotte has been charged with a violation of Articles 213 (simple intentional homicide) and 206 (bodily injuries) of

---

[1] "CR" stands for clerks record.

[2] A copy of the Treaty is attached as Exhibit I.

1   the Penal Code of the state of Jalisco, Mexico (hereinafter the "Jalisco Code"). A diplomatic note

2   from the Mexican government formed the basis for a request from Mexico for Mr. Crotte's

3   extradition (hereinafter, the "Note"). See Exhibit A (266-273). Attached to the Note is an arrest

4   warrant dated November 5, 1999, issued by a judge for the First Judicial District in Puente Grande,

5   State of Jalisco, Mexico (hereinafter, the "Warrant"). See Exhibit 14 to the Note (84-117).[3] It

6   charges Mr. Crotte with violating Articles 213 and 206 of the Jalisco Code. See id. The Warrant

7   was the result of a petition made by the prosecuting authority of the State of Jalisco

8   (hereinafter"Petition"). See Exhibit 13 to the Note (51-83).

9       **The Warrant**

10          The Warrant alleged that Mr. Crotte committed an aggravated homicide on one DANIEL

11  SANDOVAL ABUNDIS, pursuant to Articles 213 and 219 of the Jalisco Code, and caused bodily

12  injury on one JULIO CESAR SEVILLANO GONZALEZ, pursuant to Article 206 of the Jalisco

13  Code. See id. The claim of aggravated homicide by the prosecutor was premised upon an

14  allegation of unfair advantage by Mr. Crotte in relation to one DANIEL SANDOVAL ABUNDIS.

15  Id. Upon issuing the Warrant, however, the criminal court disagreed with the claim of aggravated

16  homicide and, as noted above, only issued a warrant based upon an allegation of simple intentional

17  homicide under only Article 213 of the Jalisco Code. See Exhibit 14 to the Note (107). The

18  criminal court in Jalisco issued the following order as part of the warrant:

19      FIRST - It is issued the ARREST WARRANT requested by the Public Prosecutor
        for ALDO OMAR CROTTE S AINEZ for his probable responsibility in the
20      perpetration of the crimes of INTENTIONAL SIMPLE HOMICIDE AND BODILY
        INJURIES the former perpetrated in the harm of who during lifetime was named
21      DANIEL SANDOVAL ABUNDIS and the latter in the harm of JULIO CESAR
        SEVILLANO GONZALEZ.
22
        SECOND - Be it notified personally to the assigned Public Prosecutor for his
23      knowledge and for the pertinent legal effects .

24      THIRD - Therefore, a certified copy of this decision be remitted to the Attorney
        General of Justice for the State, so as to order to whomever it may concern form his
25

26
        [3] The Warrant is one of several exhibits submitted by the government of Mexico in support
27  of the Note. All supporting exhibits follow the Note and are referred to herein by the exhibit number
    assigned by the Mexican government and a page number, which appears on the bottom right corner
28  of the extradition paperwork from Mexico.

1  personnel to direct their efforts to locate and arrest the accused, and once it be done, the accused shall be deliver to the custody of the undersigned in the Preventive
2  Metropolitan Detention Center to continue with legal sequence of the process.

3  Id. (116).

4  The Petition was based, in part, on several complaints (hereinafter the "Complaints")

5  provided to Mexican prosecutors by various witnesses. See Exhibits 2, 5-6, 10-12 to the Note (8-

6  10, 16-24, 39-50). The Complaints described how an armed mob of more than a dozen individuals,

7  seeking revenge for an alleged incident that occurred several days earlier, sought out and found

8  Mr. Crotte, and two other individuals - Rigoberto and David. Id. The mob yelled threats to harm

9  and kill Mr. Crotte, Rigoberto and David. Id. A confrontation ensued, which resulted in gunfire.

10  Id. Two individuals were struck by bullets; one died as a result of his injuries, while the other was

11  only injured. Id. Several of the Complaints were provided by members of the mob, including the

12  injured individual, all of whom admitted to deliberately seeking a confrontation with Mr. Crotte,

13  Rigoberto and David.[4] See Exhibits 2, 6, 12 to the Note (9-10, 23, 48). The other Complaints were

14  provided by uninvolved percipient witnesses. See Exhibits 5, 10-11 (9-10, 39-45). Their

15  statements, as well as statements by witnesses for whom no sworn, written Complaint was provided

16  in support of the Note, were as follows.[5]

17  **The Complaints and Witnesses**

18  Maria Luisa Cuevas Duenas. See Exhibit 5 to the Note (16-20). Ms. Duenas stated that on

19  the evening of June 26, 1999, she had been returning home after buying bread and milk with her

20  two grandchildren when she observed the events at issue. Id. On her way home, she fell in behind

21  "a group of more than ten or fifteen boys, who were holding rocks in their hands, and two of them

22  were holding guns in their hands . . . ." Id. Upon nearing her home, where Mr. Crotte had been

23  living, she "saw that those who were holding rocks started to throw them at my house, breaking

24  

---

25  [4] The Petition identified statements by some of these individuals, however, that were not
26  contained in their sworn, written statements.

27  [5] The Petition identified statements allegedly made by other members of the mob and
28  additional percipient witnesses. No sworn or signed statements, however, were provided for those individuals.

1 | windows while they were yelling LET'S FUCK THAT SISSY." Id. She then saw the group

2 | approach a parked car belonging to Mr. Crotte. Id. The group of more than ten of fifteen boys

3 | began to "break the glasses of ALDO'S car and he was inside the vehicle while they were telling

4 | him GET OUT SISSY, WE ARE GOING TO KILL YOU AND TO FUCK YOU and they kept

5 | throwing stones at his car . . . ." Id. Thereafter, she saw Mr. Crotte get out of the car being attacked

6 | and run toward her house. Id. "[I]t was then when I heard roaring as pop of corn, and everybody

7 | started running all around . . . ." Id. Acquainted with Mr. Crotte and having what she characterized

8 | as "a very strong friendship," she provided descriptive information of him. Id.

9 |       The Petition further indicated Ms. Duenas also stated that upon approaching Mr. Crotte's

10 | car, the group was "telling him GET OUT SISSY, WE ARE GOING TO KILL YOU AND TO

11 | FUCK YOU, then ALDO came out of the vehicle. It was then when she heard roaring, as pop of

12 | corn . . . ." See Petition (59).

13 |       Salvador Gonzalez Gonzalez. See Exhibit 10 to the Note (39-42). Mr. Gonzalez, who is

14 | Ms. Duenas' wife, stated that on the evening of June 26, 1999, he had been at home lying in bed.

15 | Id. While lying on his bed, he said he felt glass fall onto his body. Id. He stuck his head out the

16 | window and "saw many boys, like fifteen, because I can clearly see to the street from my window,

17 | and among them, there were two whom I saw at a distance of eight meters, and they were armed

18 | with guns while all of them were saying, "LETS FUCK THAT SISSY . . . ." Id. As he started to

19 | make his way out to the street, thereafter, he "heard noise, like corn popping, and I stayed inside the

20 | house, that is behind the entrance door, which was fully closed, and suddenly ALDO, who is a

21 | friend of the family for years and lives in my house came in running . . . ." Id. He "point[ed] out

22 | that ALDO came into the house running after the noise I heard, and all of the boys were running

23 | randomly . . . ." Id. He further explained that his "wife, MARIA LUISA arrived and she told [him]

24 | what had happened, since she had seen when those boys had been throwing stones at the house and

25 | were threatening ALDO, they had even broken the glasses of his car . . . ." Id. He and his wife

26 | feared being attacked. Id. Mr. Crotte, who shared their fear, drove off thereafter. Id.

27 | Mr. Gonzalez indicated that he had taken photographs of the damage to his house, which included

28 | "orifices on the wall in front of my house that had been caused by shooting . . . ." Id.

1    <u>Carmen Becerra Guerrero</u>. <u>See</u> Petition (60-61). Ms. Guerrero stated that she, too, was food

2    shopping and "saw a bunch of boys and girls coming, some of them take guns from little haversacks

3    and started to shoot towards calle Milpa while yelling 'DON'T CHICKEN OUT, DON'T YOU

4    HAVE ANY BALLS, COME AND GET SOME, I'LL STICK IT UP YOUR ASS" then suddenly

5    these guys began to run while a young guy fall to the floor.'[6] <u>Id.</u>

6        <u>Vicente Gonzalez Cuevas</u>. <u>See</u> Petition (61). Mr. Cuevas stated he saw "that there were

7    around 25 guys who throwing stones at his house and yelling 'GET OUT YOU

8    MOTHERFUCKERS, THIS TIME WE ARE GOING TO KILL YOU" three of them were carrying

9    guns, so he went back and saw how they broke the glass of the window, then he heard several

10   explosions made by a firearm, then the guys who were attacking started retreating . . . ."[7] <u>Id.</u>

11       <u>Carlos Crotte Guevara</u>. <u>See</u> Exhibit 11 to the Note (43-45). Mr. Guevara, Mr. Crotte's

12   father, also spoke with the prosecutor. <u>Id.</u> Mr. Guevara provided his home address and gave

13   prosecutors the name of his wife in California. <u>Id.</u> He also gave a detailed physical description of

14   Mr. Crotte, and informed officials that his son drove a white car with California license plates. <u>Id.</u>

15       <u>Jose Antonio Nava Valadez</u>. <u>See</u> Exhibit 2 to the Note (8-10). Mr. Valadez stated that he

16   and several others, who numbered "more than fifteen,""were going to fight . . . ." <u>Id.</u> "[S]ome of

17   [his] friends started yelling fucking stuff like 'hey you whiners, get out of your house, mother

18   fuckers", and then a guy came out of his house, and started shooting towards where we were with

19   his gun, and when we heard the shooting, we ran back, and ran like half a block, and when this guy

20   stopped shooting, he went back into his house . . . ." <u>Id.</u>

21       Although not in his signed statement, the Petition asserted that according to Mr. Valadez,

22   a man "holding a gun came out, and started aiming at them moving his gun from side to side, they

23   were about 7 or 8 meters away from him, then without knowing who started the other boys began

24

25

---

26       [6] The failure of both the prosecutor in Jalisco, as well as the Assistant in this case, to present
the Court with Mr. Guevara's sworn, written statement is troublesome as her recitation is
27   exculpatory for Mr. Crotte.

28       [7] <u>See</u> <u>infra</u> note 4.

1   throwing stones and breaking the glass of the window of the house, so this guy got angry and began

2   shooting at them, so everybody ran back like half a block."[8] See Petition (61-62).

3        Julio Cesar Sevillano Gonzalez (First Statement). See Exhibit 6 to the Note (21-24).

4   Mr. Gonzalez stated that he and his friends, who numbered "twenty," "were going to fight some

5   guys named Los Tejones because we were going to defend my friend DANIEL." Id. Mr. Gonzalez

6   identified Mr. Crotte by name one of those "guys" along with Rigo and David, who are brothers and

7   live at the same house occupied by Mr. Crotte. Id. Upon arriving at that house, Mr. Gonzalez and

8   the others in the group of twenty "yelled at them 'come out bastards', and in that moment the two

9   brothers RIGO and DAVID came out, as well as Aldo Omar Crotte, and I saw he was holding a gun

10   with his hand, and shoot at DANIEL and me . . . ." Id. He explained about feeling pain in his hand

11   and his chest. Id. According to Mr. Gonzalez, his "friends [then] kicked ALDO'S car and threw

12   stones at the house." Id.

13        Julio Cesar Sevillano Gonzalez (Second Statement). See Exhibit 12 to the Note (46-50).

14   In his second statement, Mr. Gonzalez stated that he had been wounded by a shotgun. Id. He

15   explained that he and "a total of around 20 (TWENTY) people" left a prearranged meeting to

16   confront several individuals, including Mr. Crotte. Id. They "left walking without carrying any

17   sticks, stones, pipes or any other kind of weapon." Id. Upon arriving at Mr. Crotte's home, they

18   "started to yell at them 'come out assholes to kick your ass' we did it several times so ALDO went

19   out holding the same weapon [a revolver] that he had used to shoot at us previously as I stated

20   before." Id. According to Mr. Gonzalez, "[w]hen ALDO went out he ran towards us aiming his

21   gun at us . . . it was at that moment that he started shooting at us as the brothers DAVID and

22   RIGOBERTO were going out too." Id. "ALDO was shooting us as we were retreating." Id.

23        Notably, the Warrant indicated that Mr. Gonzalez stated he became wounded when

24   "DAVID, RIGOBERTO and ALDO came out, and when *they* were shooting he felt his right arm

25   wounded, as well as his chest underneath the left nipple . . . ." Warrant (emphasis added) (94).

26

27

---

28      [8] Because this particular statement is not contained in Mr. Valadez's sworn, written statement, it is neither sworn nor authenticated.

1    <u>Rogelio Rios Martinez</u>. <u>See</u> Petition (53).[9] Mr. Martinez explained that "[they] were about

2    twenty and DANIEL [SANDOVAL ABUNDIS] told them they were to go to Colonia El Vigia to

3    fight some FUCKING BATOS since they were upsetting him . . . ." <u>Id.</u> He claimed that the group

4    saw nobody and had decided to "go[] back." <u>Id.</u> After walking only a few meters back, he heard

5    gunshots, which caused everybody to run. <u>Id.</u>

6        The Petition also indicated that Mr. Martinez stated when they arrived near a chapel in la

7    colonia El Vigia, "they saw three guys who were members of the band LOS TEJONES coming out

8    of a house which is front of the chapel." <u>See</u> Petition (63). He stated that as the group "began

9    running back," "no more shooting was heard . . . ." <u>Id.</u> Shortly thereafter, upon returning to the

10    same place where he saw the three guys, another round of shooting ensued, which is when "DANY"

11    and "JULIO CESAR" fell to the ground. <u>Id.</u>

12        <u>Magdalena Abundis Ortega</u>. <u>See</u> Petition (56-57).[10] She identified the deceased as her son,

13    Daniel Abundis. <u>Id.</u> She stated she had been "informed that a person coming from the United

14    States of America had killed her son ignoring how the facts had taken place." <u>Id.</u>

15        <u>Oscar Eduardo Sandoval Abundis</u>. <u>See</u> Petition (59).[11] He stated that he learned from his

16    own inquiries that "the person that killed his brother DANIEL was named ALDO OMAR CROTE

17    . . . ." <u>Id.</u> He said he learned this from an "acquaintance," but provided no name. <u>Id.</u>

18    **Ballistics Evidence**

19        Interestingly, ballistics evidence recounted by the medical examiner in the Petition does

20    not prove the bullet causing the death belonged to a handgun. According to the Petition,

21        It was received the Official Letter number 18696199 coming from the Forensic
         Science Institute of Jalisco signed by the Forensic Ballistics Experts in which they
22        submit the result of the Comparative and Identifying Ballistics Report performed on

23
         _____

24    [9] Nothing in the exhibits attached to the Note indicate a sworn statement was ever taken from
      this individual or that any such statement was ever authenticated.

25
26    [10] <u>See</u> <u>infra</u> note 4. Additionally, her statement fails to indicate she speaks from personal
      knowledge, fails to identify the sources for her belief, and fails to identify the circumstances from
27    which she concluded that the sources were reliable and credible.

28    [11] <u>See</u> <u>infra</u> note 4. Additionally, his statement fails to identify the circumstances from which
      he concluded that the sources were reliable and credible.

1    the projectile extracted from the corpse of the deceased, concluding that the
2    projectile corresponds to .22 caliber (Long-Rifle) lead-bullet, without being possible
     to determine from what kind of gun it could have come.

3    Petition (59). According to a note by the translator, the ballistics report "was not translated since

4    the photocopy given to the Public Prosecutor handling the case was not legible." Exhibit 8 to the

5    Note (32).

6        **Mexican Warrant**

7        As a result of the Complaints, and additional unsworn medical reports and unsworn

8    investigative statements by the prosecutor, see Exhibits 1, 3-4, 8 (5-7, 11-15, 28-32), the Petition

9    was submitted to the judge in Jalisco and the Warrant was issued. See Exhibit 14 to the Note. The

10   Petition and Warrant each incorporated the Complaints nearly word for word. See Exhibits 13 and

11   14 to the Note. The Petition and Warrant, however, also: (1) identified statements not contained

12   in the witnesses' sworn Complaints; and, (2) presented statements by witnesses for whom no sworn,

13   written Complaints were provided in support of the request for extradition. Id. Neither the

14   Complaint nor the Warrant is sworn out under penalty of perjury. See Exhibits 13-14 to the Note.

15   Nonetheless, based solely on the *ex-parte* interviews with the Complainants, the judge in Jalisco

16   ordered that Mr. Crotte be presumed guilty. See Exhibit 14 to the Note.

17   **B.    Mr. Crotte's Arrest.**

18       On December 25, 2006, Mr. Crotte was arrested by Immigration and Customs Enforcement

19   officials at the San Ysidro Port of Entry. He, thereafter, was placed into removal proceedings

20   before an immigration judge, who on March 20, 2007, terminated that proceeding upon motion by

21   the government without any order of removal being issued. See Exhibit B. Mr. Crotte was

22   subsequently transferred to custody of the United States Marshals to appear before this Court

23   pursuant to the Complaint filed by the United States Attorney.

24       At the time of his arrest at the port, Mr. Crotte was returning to his place of residence in San

25   Francisco, where has lived continuously since 1982. He has resided lawfully in the United States

26   since 1980 and has a status of Lawful Permanent Resident, which was granted to him by an

27   immigration agency of the United States government in 1988-89. Id. He has resided in San

28   Francisco at the same address for more than 20 years. Id. Since his entry in 1980 and since moving

1    to his current home in 1982, Mr. Crotte has maintained employment under his true name, paid taxes

2    under his true name, collected disability benefits under his true name due to a work related injury,

3    filed a disability claim with the state of California under his true name, attended school under his

4    true name, and received medical treatment under his true name.[12] See Exhibits C, D, E, F. He is

5    well known throughout the community and his mother maintained regular contact with him. See

6    Exhibits G, H. As evidenced by his initial arrest at the port, Mr. Crotte traveled to and from Mexico

7    and upon returning to the United States underwent immigration inspection using his true name.

8    Several of the Complaints confirm that Mr. Crotte, in fact, traveled to Jalisco repeatedly. See

9    Exhibits 5-6 to the Note (16-24).

10   **C.     The Magistrate's Partial Certification for Extradition.**

11          On February 2, 2008, the Magistrate Court issued the Partial Certification Order and granted

12   a partial certification for extradition in this matter. Judge Adler certified Mr. Crotte for extradition

13   based *only upon the homicide charge*. With regard to the bodily injury charge, the Magistrate Court

14   concluded that the statute of limitations under Mexican law, specifically Article 85 of the Jalisco

15   Penal Code, had run and that "prosecution of the battery charge is barred . . . ." Partial Certification

16   Order at 12. The Magistrate Court, thereafter, denied the arguments in opposition to extradition set

17   forth below.

18                                          **V.**

19                 **LEGAL GROUNDS IN SUPPORT OF PETITION**

20   **A.     Introduction.**

21          Mr. Crotte challenges the Partial Certification Order because: (1) he does not fall within the

22   jurisdiction of this Court given the lapse of the United States statute of limitations as to the

23   homicide charge; (2) certification is at odds with the terms of the Treaty in light of the Partial

24   Certification Order granting extradition on only one of two charges rather than *all* charges; and, (3)

25   there is not competent evidence upon which to base his extradition, e.g., no probable cause exists

26   especially given the ballistics evidence. See Vo, 447 F.3d at 1240. Mr. Crotte respectfully requests

27   _____

28   [12] Many of these records, including the federal income tax records, identify his address in
     San Francisco.

1   that his Petition for Writ of Habeas Corpus be granted, the Partial Certification Order be reversed

2   and he be released from custody forthwith.

3   **B.   The Government Bore the Burden of Proving that Certification Was Appropriate.**

4

5       The Government moved to have Mr. Crotte certified for extradition to Mexico.  As such,

6   the burden fell on the government to prove the following:  "(1) the existence of a warrant for [the

7   person's] arrest;  (2) the existence of a treaty providing for extradition for the charged offense for

8   which the warrant was issued;  (3) that [the person sought to be extradited] is the person named in

9   the warrant;  (4) that there is probable cause to believe that [the person] committed the offense[s]

10   charged;  and (5) that the facts alleged would also constitute an offense in the United States (dual

11   criminality)." In re Extradition of Platko, ("Platko") 213 F. Supp.2d 1229, 1235 (S.D. Cal. 2002)

12   (citing and quoting Petition of France for Extradition of Sauvage, ("Sauvage") 819 F. Supp. 896,

13   897 (S.D. Cal. 1993)); see also United States v. Peterka, 307 F. Supp.2d 1344, 1350 (M.D. Fla.

14   2003) (dual criminality is an essential element to the government's burden of proof in the extradition

15   hearing) (internal quotations and citations omitted); and 18 U.S.C. § 3184.

16       In certain cases, the extradition treaty itself may provide specific circumstances in which

17   extradition should not be granted.  The Treaty here specifically prohibits extradition in situations

18   where prosecution of the subject offense would be time barred under the statute of limitations in

19   either the requesting or the requested state.  See 31 U.S.T. 5059 at Art. 7; see also Caplan v. Vokes,

20   649 F.2d 1336, 1342 (9th Cir. 1981) (statute of limitations clause written into treaty prevented

21   extradition).  The burden falls on the government to prove that it has complied with the statute of

22   limitations.  See, e.g., United States v. Brown, 936 F.2d 1042, 1049-50 (9th Cir. 1991); United

23   States v. Thomas, 893 F.2d 1066, 1071 (9th Cir. 1990); Buhler v. United States, 33 F.2d 382 (9th

24   Cir. 1929); see also Az Din v. United States, 232 F.2d 283, 287 (9th Cir. 1956) (the government

25

26

27

28

1   has the burden of proving that the criminal act was within the limitations period) (citing <u>Buhler</u>, 33

2   F.2d 382).[13]

3          Finally, "interpretation of [a treaty] must, of course, begin with the language of the treaty

4   itself.  <u>See</u>  <u>United States v. Stuart</u>, 489 U.S. 353, 365-66 (1989) (citing and quoting <u>Sumimoto</u>

5   <u>Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176, 180 (1982)).  Unless the obvious meaning of the

6   words conflicts with the intent of the treaty, "[t]he clear import of the treaty language controls . . . ."

7   <u>Stuart</u>, 489 U.S. at 365.

8   **C.    The United States Statute of Limitations Has Run as to the Homicide Charge
           Thereby Precluding Extradition on that Allegation.**

9

10          **1.    The Treaty.**

11          Article 7 of the Treaty with Mexico is entitled "Lapse of Time."  <u>See</u> Treaty, Art. 7.  Article

12   7 reads as follows: "Extradition shall not be granted when the prosecution or the enforcement of the

13   penalty for the offense for which extradition has been sought has become barred by lapse of time

14   according to the laws of the requesting or requested party."  <u>Id.</u>  Thus, under the plain language of

15   Article 7, the government must prove that the prosecution for which extradition is sought is not

16   barred - - under both Mexican law *and* the laws of the United States - - by the statute of limitations.

17   <u>See, e.g.</u>, <u>Caplan</u>, 649 F.2d at 1341-42 (finding that government did not prove that relator was a

18   fugitive from justice and thus holding that extradition was barred by the statute of limitations);

19   <u>Clarey v. Gregg</u>, 138 F.3d 764, 766 (9th Cir. 1998).  When determining, in the extradition setting,

20   whether a prosecution is barred by a statute of limitations this Court has held:

21          The limitations provision of [a] treaty, no less than any found in domestic law,
            represents an important right of the accused.  As the Supreme Court has stated,
22          statutes of limitation "provide predictability by specifying a limit beyond which there

23   _____

24          [13] Numerous other Circuits have adopted the Ninth Circuit's approach to the burden of proof

25   issue.  <u>See, e.g.</u>, <u>United States v. Wilson</u>, 249 F.3d 366, 373 (5th Cir. 2001); <u>United States v. Oliva</u>,
     46 F.3d 320, 324-25 (3rd Cir. 1995); <u>United States v. Sax</u>, 39 F.3d 1380, 1387-88 (7th Cir. 1994);

26   <u>United States v. Hauck</u>, 980 F.2d 611, 613-14 (10th Cir. 1992); <u>United States v. Juodakis</u>, 834 F.2d
     1099, 1105 (1st Cir. 1987); <u>United States v. Portsmouth Paving Corp.</u>, 694 F.2d 312, 324 (4th Cir.

27   1982); <u>United States v. Hankin</u>, 607 F.2d 611, 612-13 (3rd Cir. 1979) (government has the burden
     of proof that the prosecution was instituted within the applicable statute of limitations) (citing

28   <u>Grunewald v. United States</u>, 353 U.S. 391, 396 (1957)).

1    is an irrebuttable presumption that a defendant's right to a fair trial would be
     prejudiced." *Criminal statutes of limitations are therefore liberally interpreted in*
2    *favor of repose.*

3    Caplan 649 F.2d at 1341 n. 7 (emphasis added) (quoting and citing United States v. Marion, 404

4    U.S. 307, 322, 92 S. Ct. 455, 464 (1971); and citing Toussie v. United States, 397 U.S. 112, 115,

5    90 S. Ct. 858, 860 (1970)). Thus, the statute of limitations clause of Article 7 of the Treaty should

6    be read "liberally" in favor of Mr. Crotte. Id.

7          **2.    The United States Statute of Limitations Has Run as to the
                    Homicide Charge.**
8

9          Title 18, U.S.C. § 3282 controls the statute of limitations in cases that are not capital in

10   nature. It reads in pertinent part:

11         Except as otherwise expressly provided by law, no person shall be prosecuted, tried,
           or punished for any offense, not capital, unless the indictment is found or the
12         information is instituted within five years next after such offense shall have been
           committed.
13

14   The five year period begins to run when all of the elements of the offense have been committed.

15   See United States v. Beardslee, 197 F.3d 378, 385 (9th Cir. 1999) (citing United States v. Drebin,

16   557 F.2d 1316, 1333 (9th Cir. 1977)). As noted earlier, according to the Note, Mr. Crotte has been

17   charged under Article 213 of the Jalisco Code for alleged acts committed on June 26, 1999, which

18   is the same date the alleged victims were injured and died. The limitations period, thus,

19   commenced on this same date because the alleged conduct was complete. See United States v.

20   Brace, 149 F. 874, 877 (D.C. Cal. 1907) (noting that crime of murder is complete and at an end

21   when the deed is done). That would mean the statute of limitations would run by June 26, 2004.

22         A plain reading of Article VII of the Treaty requires this Court to adhere to the strictures of

23   18 U.S.C. § 3282. See Treaty, Art. VII ("Extradition shall not be granted when the prosecution . . .

24   has become barred by lapse of time *according to the laws of the requesting or requested party*")

25   (emphasis added). Under the law of the United States prosecution is barred if an indictment is not

26   found, or information consented to, within five years. See 18 U.S.C. § 3282.

27         Obviously, since Mr. Crotte is not charged here in the United States with a crime there never

28   was, nor would there ever be, an indictment or information. Thus, five years is the window with

1    which Mexico has to work with in non-capital cases.[14]  That does not mean, however, that if a

2    person flees from extradition that person need only have to stay hidden for the five year period of

3    limitations.  United States law provides for extending the statute of limitations period when a

4    person is a fugitive from justice.  See 18 U.S.C. § 3290 ("[n]o statute of limitations shall extend to

5    any person fleeing from justice").  Mr. Crotte raises this point to illustrate that his argument does

6    not stand practicality on its head; i.e., the treaty still provides Mexico with plenty of time - - infinite

7    in fact - - to extradite those individuals attempting to avoid extradition.  Unlike, the case in Caplan,

8    649 F.2d at 1341, the government, to date, has not asserted that Mr. Crotte deserved fugitive status

9    pursuant to § 3290.[15]

10        By June 26, 2004, no indictment had been found and no information had been committed.

11    As such, the statute of limitations has run.  Certification must be denied.

12        The government is likely, however, to argue that the statute of limitation was tolled by what

13    amounted to the issuance of an arrest warrant on November 5, 1999, in Jalisco, Mexico (the

14    Warrant).  However, such a view is too simplistic.  In Quinn v. Robinson,783 F.2d 776, 816-17 (9th

15    Cir. 1986), a similar issue was raised.  In Quinn the petitioner argued that he could not be deported

16    to the United Kingdom because the statute of limitations had run on a conspiracy charge brought

17    in that country.  See id.  The government argued that the statute of limitations under 18 U.S.C.

18    § 3282 had been tolled by the "laying of an information" in the United Kingdom within the five year

19    period.  See id. at 816.  The court declined to rule on the issue but noted:

20

21    _____

22        [14]  In its Partial Certification Order, the Magistrate Court agreed with Mr. Crotte that the
      conduct identified the Warrant "more strongly resembles second degree murder or manslaughter,
23    which are non-capital offenses."  Partial Certification Order at 15.  Accordingly, Judge Adler
      concluded that "the five year statute of limitations in 18 U.S.C. § 3282 is applicable to the homicide
24    charge against Crotte."  Id.

25        [15]  In fact, the Magistrate Court held that the government, which must "show by a
26    preponderance of the evidence that [Respondent] acted with an intent to avoid prosecution", Partial
      Certification Order at 18, n.11, "has not made the requisite showing."  Id. According to Judge Adler,
27    "[t]he government has provided no information which would permit the Court to even analyze the
      issue, let alone conclude that Crotte was fleeing from justice within the meaning of [18 U.S.C.]
28    § 3290."  Id.

1        The multiple legal questions involved in the statute of limitations issue are
    complicated; their resolution is not clear and could even lead to the introduction of
2   additional facts. Accordingly, it would not be proper for us at this time to decide
    this issue which the district court did not reach and the parties have not briefed on
3   appeal.

4   Id. at 817.[16]

5        The issue of statute of limitations, in the context of extradition, is a complex one - if for no

6   other reason than the courts must deal with the laws of two different sovereigns. Mr. Crotte argues

7   that the plain reading of Article VII would require the United States to have found an indictment

8   to toll the statute of limitations. However, if this Court chooses to reject Mr. Crotte's reading of

9   _____

10      [16] Quinn is the only case from the Ninth Circuit that Mr. Crotte has found that acknowledges

11  the difficult question of whether a foreign proceeding may toll the United States' statute of
    limitations and if so under what circumstances. Mr. Crotte, however, draws the Court's attention to

12  two cases that assume in dicta, without analysis or reasoning, that a foreign proceeding may toll the
    statute of limitations. In Caplan, 649 F.2d at 1342, the Ninth Circuit reversed the district court's

13  certification for extradition because the statute of limitations had run and the government failed to

14  prove that the relator had fled from justice. In a foundational prelude to its ultimate holding, the
    opinion states, "[m]easuring from the date of the London arrest warrant, May 18, 1978, we are

15  concerned under this inquiry with charges involving acts prior to May 18, 1973." In Theron v. U.S.
    Marshal, 832 F.2d 492 (9th Cir. 1987) (abrogated on other grounds by United States v. Wells, 519

16  U.S. 482 (1997)),the relator argued, inter alia, that the statute of limitations time barred his

17  extradition because a 1981 South African indictment charged the relator with crimes that took place
    in 1975. See id. at 498-99. The Court held that the 1981 indictment was prepared in connection

18  with the extradition and that it merely incorporated an earlier indictment, prepared in 1979, on the
    same charges. See id. Thus, because the 1979 indictment fell within the applicable statute of

19  limitations extradition was not time barred. See id. In both Caplan and Theron, the assumption that

20  the statute of limitations may be tolled by a foreign proceeding was made without analysis,
    reasoning, litigation or the consideration of alternatives. In both cases it was simply a foundational

21  prelude to deciding the issues actually being litigated by the parties before the court. Thus, such
    assumptions are merely dicta and do not guide this Court's decision making process. See Pakootas

22  v. Teck Camino Metals, Ltd., 452 F.3d 1066, 1082 (9th Cir. 2006) ("Where it is clear that a
    statement is made casually and without analysis, where the statement is uttered in passing without

23  due consideration of the alternatives, or where it is merely a prelude to another legal issue that

24  commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.")
    (internal quotations omitted) (citing and quoting United States v. Johnson, 256 F.3d 895, 915 (2001)

25  (en banc) (opinion of Kozinski, J.)); accord Miranda B. v. Kitzhaber, 328 F.3d 1181, 1186 (9th Cir.

26  2003) (per curiam); see also Johnson, 256 F.3d at 920 (Tashima, J., concurring) (a discussion that
    "is unnecessary to [the] disposition of [a] case . . . is dictum."); accord Sosa v. DIRECTV, Inc., 437

27  F.3d 923, 928 n. 3 (9th Cir. 2006) (same); see also Miller v. Gammie, 335 F.3d 889, 900-01 (2003)

28  (en banc) (Kozinski, J., concurring) (arguing that Miranda B. adopted the definition of dicta set forth
    in his Johnson opinion).

1  Article VII the Court is left with the awkward situation of applying Mexican law (i.e., the Warrant

2  and the procedures to obtain it) to the United States' law of limitations. The question then is: would

3  a Mexican arrest warrant be enough to toll the statute of limitations under 18 U.S.C. § 3282? The

4  answer is plainly no.[17]

5      The manner in which the prosecuting authority in Jalisco obtained the Warrant is in no way

6  analogous to the finding of an indictment. He first interviewed Complainants. See Exhibits 2, 5-6,

7  10-12 to the Note. He compiled the *ex-parte* hearsay statements and put them into a request (being

8  referred to herein as the Petition) for the Warrant. See Exhibit 13 to the Note. The judge, after

9  reviewing the Petition, issued the Warrant on November 5, 1999, calling for the arrest of Mr. Crotte.

10 See Exhibit 14 to the Note. In addition to calling for his arrest, the Warrant presumed Mr. Crotte

11 guilty of the offense for which he was to be arrested. Id.

12     In the United States, one of either an indictment or information must be obtained in any case

13 where the crime is punishable by more than one year.[18] See FED. R. CRIM. P. 7. In such a case, an

14 information may be obtained only after the defendant waives his right to be prosecuted by

15 indictment. See FED. R. CRIM. P. 7(b). Thus, a defendant must consent to be prosecuted by

16 information. Obviously, the Warrant was issued without Mr. Crotte's consent.

17     As for an indictment, the Sixth Amendment to the United States Constitution holds that

18 "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on

19 presentment or indictment of a Grand Jury . . . ." U.S. Const. VI Amend. Moreover, "any offense

20 punishable by imprisonment for a term of over one year is an infamous crime." Advisory

21 Committee Notes to FED. R. CRIM. P. 7. Thus, before the government can prosecute a person for

22 a crime punishable by more than one year, the government must first present its case to a grand jury.

23     Grand Juries are "selected at random from a fair cross section of the community in the

24

---

25 [17] It is noteworthy to mention that even issuance of a Mexican arrest warrant does not toll
   the statute of limitations under Mexican law. In fact, Article 83 specifically states that the statute
26 of limitations "shall only be interrupted by the arrest of the defendant." The article says nothing
   about a Mexican arrest warrant stopping the statute of limitations.
27

28 [18] According to the Mexican government, the crime with which Mr. Crotte is charged carries
   a penalty of 12 to 18 years. See Exhibit 16 to the Note.

1  district or division wherein the court convenes." See 28 U.S.C. § 1861. Moreover, "[n]o citizen

2  shall be excluded from service as a grand [ ] juror in the district courts of the United States or in the

3  Court of International Trade on account of race, color, religion, sex, national origin, or economic

4  status." 28 U.S.C. § 1862. The Grand Jury must be comprised of at least sixteen citizens (but no

5  more than twenty-three). See FED. R. CRIM. P. 7(a)(1). Moreover, the Grand Jury may only indict

6  if twelve jurors concur. See FED. R. CRIM. P. 7(f). Finally, if a person is indicted they are

7  nonetheless presumed innocent of the charges. See United States v. Olvera, 30 F.3d 1195, 1196

8  (9th Cir. 1994). Thus, in the United States, a random selection of citizens or "peers," ranging in

9  number from sixteen to twenty-three, ultimately decides whether the government may proceed with

10  prosecution.

11         The procedure by which the Warrant was issued for Mr. Crotte in Jalisco was in no way

12  analogous to the finding of a bill of indictment. Instead of putting its evidence to a group of citizens

13  taken from the community, that represent a fair cross section of the community, the prosecutor took

14  his "evidence" - - procured ex-parte - - to a judge. See Exhibit 13 to the Note. In the United States,

15  this is analogous to the issuance of a warrant based on a complaint.[19]  See FED. R. CRIM. P. 3 and

16  4. Under United States law, however, a complaint does not toll the statute of limitations. Thus,

17  neither does the Warrant. Finally, unlike an indictment - - or even a complaint for that matter - -

18  the Warrant presumed Mr. Crotte guilty.

19         A witness called by the United States at a hearing before Magistrate Judge Adler aptly

20  explained these deficiencies in the Mexican legal process. See Exhibit K.

21

22

23

24

25

26

27  [19] Although analogous to a United States arrest warrant issued pursuant to a complaint, the Warrant would not even meet the standards required under Rules 3 and 4 that govern warrants and complaints. Under Rule 3 the complaint must be "made under oath . . . ." FED. R. CRIM. P. 3. The Petition upon which the Warrant was based was not made under oath.

28

**D.    Article 14 of the Treaty Precludes Surrender of Mr. Crotte by the United States to the Government Mexico on the Homicide Allegation Given the Inability to Extradite for the Bodily Injuries Allegation.**

The inability to extradite Mr. Crotte on the basis of the bodily injuries charge precludes surrender of Mr. Crotte by the United States to the government of Mexico for the remaining homicide charge.  Doing so would violate the plain language of the governing extradition Treaty between the United States and Mexico.

Article 14 of the Treaty, entitled "Decision and Surrender" sets forth the requested party's obligations subsequent to a magistrate court's ruling on the requesting party's application for extradition.  See Treaty, Art. 14.  The plain language of Article 14 precludes extradition, or "surrender" by the requested party, where a magistrate court issues a "partial" denial of the requesting party's application for extradition. Assuming the Court agreed with the previous argument, or any other argument in opposition to the requested extradition certification on the bodily injuries charge herein, a "partial rejection" will have occurred.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992) (citations omitted).  The Supreme Court has explained that the "language of a treaty must be followed unless a plain language interpretation 'effects a result inconsistent with the intent or expectations of' the signatory nations." United States v. Lazarevich, 147 F.3d 1061, 1064 (9th Cir. 1998).  Article 14 of the Treaty entitled "Decision and Surrender" provides:

1.    The requested Party shall promptly communicate to the requesting Party its decision on the request for extradition.

2.    In the case of complete or partial rejection of a request for extradition, the requested Party shall give the reasons on which it was based.

3.    If the extradition is granted, the surrender of the person sought shall take place within such time as may be prescribed by the laws of the requested Party. The competent authorities of the Contracting Parties shall agree on the date and place of the surrender of the person sought.

1  Treaty, Art. 14. The plain language of the second subsection states that where a "partial rejection

2  of a request for extradition" occurs, "reasons" for the denial must be provided to the requesting

3  party. The requested party's obligations subsequent to a magistrate court's "partial rejection" of an

4  extradition do not include or permit "surrender of the person sought." Only the third subsection

5  permits the requested party to "surrender [] the person sought" to the requesting party. That

6  subsection, however, only applies "[i]f the extradition [request] is granted." Because the second

7  subsection speaks in terms of a "partial rejection," whereas the third subsection does not, the plain

8  language of the third subsection only contemplates a complete grant of extradition on all bases

9  submitted by the requesting party. Otherwise, the third subsection would have spoken in terms of

10  a "partial" grant of a request for extradition. Thus, in cases of a "partial rejection of a request for

11  extradition," the plain language contained in Article 14 does not allow for "surrender of the person

12  sought" to the requesting party.

13        This reading is consistent with the canon "expressio unius exclusio alterius," which instructs

14  that "[w]here Congress includes particular language in one section of a statute but omits it in

15  another section of the same Act, it is generally presumed that Congress acts intentionally and

16  purposefully in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23

17  (1983) (citation omitted). The second subsection's failure to explicitly permit "surrender of the

18  person sought" is strong evidence that the drafters of the Treaty simply chose not to permit

19  "surrender" in that provision - where a "partial rejection" occurs. Likewise, the third subsection's

20  failure to expressly include the phrase "partial grant" indicates that the drafters of the Treaty chose

21  not to permit "surrender" where anything less than all the bases for extradition are granted. See

22  President of U.S. ex rel. Caputo v. Kelly, 96 F.2d 787, 789 (2nd Cir. 1938) ("It is argued that,

23  because of the provision of article 8 and of the canon 'expressio unius exclusio alterius,' the

24  contracting sovereigns must have intended that only the statute of limitations of the country to

25  which the requisition is addressed should be considered in extradition proceedings and that the

26  application of the statute of the demanding state should be left for determination by the courts of

27  the latter"); see also Boudette v. Barnette, 923 F.2d 754, 756-57 (9th Cir.1991) (the doctrine of

28

1 | *expressio unius est exclusio alterius* teaches that omissions are the equivalent of exclusions when

2 | a statute affirmatively designates certain persons, things, or manners of operation).

3 | **E.    The Doctrine of Specialty and Fundamental Fairness Also Precludes Extradition.**

4 | The doctrine of "specialty" is a long-standing principle which prohibits the requesting nation

5 | from prosecuting the extradited individual for any offense other than that for which the surrendering

6 | nation agreed to extradite. See United States v. Raushcer 119 U.S. 407, 420-21 (1886).

7 | Article 16 of the Treaty further provides:

8 | A person extradited under the present Treaty shall not be detained, tried or punished
    in the territory of the requesting Party for an offense other than that for which
9 | extradition has been granted . . .

10 | Thus, to the extent that the government has alleged offenses which are not time-barred,

11 | Mexico must agree that Mr. Crotte will not be prosecuted for an offense other than that which the

12 | United States government has agreed to extradite him. Thus, absent a guarantee from Mexico, Mr.

13 | Crotte should not be extradited for those offenses which are not time-barred under the doctrine of

14 | specialty and fundamental fairness.

15 | **F.    Probable Cause Does Not Exist to Justify Extradition.**

16 | Article 3 of the Treaty reads as follows:

17 | Extradition shall be granted only if the evidence be found sufficient, according to
    the laws of the requested Party, either to justify the committal for trial of the person
18 | sought if the offense of which he has been accused had been committed in that place
    or to prove that he is the person convicted by the courts of the requesting Party.
19 |

20 | See Treaty, Art. III.  Courts have interpreted such provisions in similar treaties as "requiring a

21 | showing by the requesting party that there is probable cause to believe the accused has committed

22 | the charged offense." Quinn, 783 F.2d at 783; Platko, 213 F.Supp.2d at 1239. "To make the

23 | probable cause determination, 'a judge is to review the evidence presented and make an

24 | independent determination that the accused committed the crimes alleged." Platko, 213 F. Supp.

25 | 3d at 1239.  The probable cause standard in extradition proceedings is analogous to the quantum

26 | of proof required in preliminary hearings in federal court. See Bovio v. United States, 989 F.2d

27 | 255, 259 (7th Cir.1993).  Under this standard, the government must offer evidence "sufficient to

28 |

1   cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of

2   the accused's guilt." Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C.Cir.1973).

3          "To support a finding of probable cause under either federal or California law, an affidavit

4   must contain factual support for the affiant's conclusions and either an assertion that the affiant

5   speaks from personal knowledge or a statement of the sources for the affiant's belief and the

6   circumstances from which the affiant concluded that the sources were reliable and credible."

7   Petition of France for Extradition of Sauvage ("Sauvage"), 819 F.Supp. 896, 897 (S.D. Cal. 1993).

8   Admittedly, the credibility of witnesses and the weight to be accorded their testimony is within the

9   province of the extradition magistrate. See Garcia-Guillern v. United States, 450 F.2d 1189, 1192

10  (5th Cir.1971).  However, the magistrate's independent review allows the court to act in a neutral

11  and detached manner, and not merely as a rubber stamp. Platko, 213 F. Supp. 2d at 1239.

12         The introduction of evidence in the context of an extradition determination is quite limited.

13  "The primary source of evidence for the probable cause determination is the extradition request and

14  any evidence submitted in it is deemed truthful for purposes of this determination." In Extradition

15  of Atta, 706 F.Supp. 1032, 1050-51 (E.D.N.Y.1989).  Generally, evidence that explains away or

16  completely obliterates probable cause is the only evidence admissible at an extradition hearing,

17  whereas the evidence that merely controverts the existence of probable cause, or raises a defense,

18  is not admissible. See United States v. Linson, 88 F.Supp.2d 1123, 1126 (D. Guam 2000) (citing

19  Charlton v. Kelly, 229 U.S. 447, 457-58 (1913)).  Notably, neither Linson nor Charlton exempt the

20  court presiding over the extradition matter from such a restriction.  In In re Extradition of Chavez,

21  408 F. Supp. 2d 908, 911 (N.D. Cal. 2005), the district court aptly summarized the ability to present

22  evidence at an extradition hearing.

23         [T]he right of the fugitive to present evidence on his own behalf is limited: "he is
           not permitted to introduce evidence on the issue of guilt or innocence, but can only
24         offer evidence that tends to explain the government's case of probable cause."
           Hooker v. Klein, 573 F.2d 1360, 1368 (9th Cir.1978).  "[E]vidence of alibi or of
25         facts contradicting the demanding country's proof or of a defense such as insanity
           may properly be excluded from the Magistrate's hearing." Shapiro v. Ferrandina,
26         478 F.2d 894, 901 (2d Cir.1973), citing Charlton v. Kelly, 229 U.S. 447, 456, 33
           S.Ct. 945, 57 L.Ed. 1274 (1913); but see In re Extradition of Gonzalez, 52
27         F.Supp.2d 725, 739 (W.D. La.1999) ("Evidence of an alibi defense is ... admissible
           if it negates or obliterates probable cause, but not if it merely controverts the
28         evidence of the requesting country").

See also Extradition of Garcia, 890 F.Supp. 914, 922-23 (S.D. Cal.1994) (explaining that the court may not admit and consider evidence submitted by Relator which merely conflicts with or contradicts evidence submitted by the United States on the issue of probable cause or impeaches the credibility of witnesses, but may admit and consider explanatory evidence submitted by Relator if it would clearly negate or obliterate probable cause); Extradition of Koskotas, 127 F.R.D. 13, 25 (D.Mass.1989) (same).

Here, Mr. Crotte is charged with homicide under Article 213 of the Jalisco Code, allegedly occurring as a result of gunfire hitting one individual. Mr. Crotte disputes the existence of probable cause for the following reasons.

**1.    Numerous Shooters Defended Themselves Against the Mob.**

First, Mr. Crotte was not the only person who the mob sought to confront as evidenced by the Complaints identifying Rigoberto and David as additional targets for the mob. As expected, these two individuals were with Mr. Crotte at the time of the alleged shootings and, according to one Complaint, both appeared with Mr. Crotte at the outset of the confrontation prior to any gunfire. See Exhibit 6 to the Note. Thus, it is likely one of these two other men is responsible for the shootings. This likelihood gains support given the criminal court's discussion of alleged events in the Warrant. The Warrant recounted the statement of Mr. Gonzalez who was shot, but only wounded. According to the finding by the criminal court, Mr. Gonzalez stated he avoided some initial gunfire, but later became wounded when "DAVID, RIGOBERTO and ALDO came out, and when *they* were shooting he felt his right arm wounded, as well as his chest underneath the left nipple . . . ." Warrant (emphasis added). By stating "*they*" rather than "he," it is clear that several individuals, not simply Mr. Crotte, were in fact discharging firearms in the direction of the mob. Id.

**2.    The Mob's Members Used Firearms.**

Second, at least 4 percipient witnesses placed firearms in the possession of several members of the mob. See Exhibit 5, 10, Petition. Thus, it is possible that one of the mob's members are responsible for the shootings as a result of "friendly fire." Mr. Gonzalez told the prosecutors that he located and photographed projectile marks made by gunfire on the facade of the house where he

1  lived and where Mr. Crotte had been staying.  See Exhibit 10 to the Note.  This finding indicates

2  gunfire occurred in the direction of Mr. Crotte, Rigoberto and David.  Consistent with this

3  proposition, Ms. Guerrero also informed prosecutors that she "saw a bunch of boys and girls

4  coming, some of them take guns from little haversacks and started to shoot towards calle Milpa .

5  . . ."  See Petition.  According to Ms. Guerrero, she "suddenly" saw "a young guy fall to the floor."

6  Id.  Finally, the Petition indicated that chemical tests for gunshot residue consistent with discharge

7  of a firearm were positive for at least two members of the mob - Jose Antonio Nava Valadez

8  ("positive in right hand internal side") and Cain Juan Eduardo Villanueva Alvarez ("POSITIVE in

9  right hand internal side").  See Petition.  Thus, it is likely that the gunshots killing and wounding

10  the two individuals came from weapons fired by their friends, not by Mr. Crotte.

11        **3.      The Percipient Witnesses Do Not State That They Saw Mr.
               Crotte Possess or Use a Firearm.**

12

13       A thorough reading of the percipient witnesses' statement indicates that none of them saw

14  Mr. Crotte possess or use a firearm during the course of events that transpired.  Several of the

15  witnesses indicated that they had a clear and unobstructed view, or saw the scene from an elevated

16  vantage point, lending reliability to their recitation of events.  Furthermore, the percipient witnesses'

17  statements are all similar and consistent with regard to the events and their sequence.

18        **4.      Inconsistent Statements by the Remaining Witnesses and
               Conflicts Between th e Witnesses' Statements Reduce Their
               Evidentiary Weight.**

19

20       In considering the Complaints made by members of the attacking mob, it is immediately

21  apparent that individuals often conflicted themselves within their own statements.  When compared

22  to each other, it is even more apparent that these individuals provided wildly divergent descriptions

23  of what occurred June 26, 1999, which only creates greater uncertainty.  As a result, these

24  statements are inherently untrustworthy and lack an indicia of reliability.  They cannot support a

25  finding of probable cause.

26       First, Mr. Gonzalez, who made multiple statements to prosecutors, provided two different

27  stories as to the events of June 26, 1999.  He initially stated that after shots had been fired, his

28  friends kicked Mr. Crotte's car and threw rocks at the windows of the house.  See Exhibit 6 to the

1    Note. He later claimed that the mob retreated once the gunfire began and he did not state anything

2    about the throwing of rocks. See Exhibit 12 to the Note. Mr. Martinez also initially alleged that

3    Mr. Crotte exited the house and began firing when called outside by the mob. See Exhibit 6 to the

4    Note. His story later changed to Mr. Crotte exiting the house, running after the mob, and then firing

5    at them. See Exhibit 12 to the Note.

6         Second, Mr. Nava's two descriptions of the events to prosecutors had Mr. Crotte allegedly

7    discharging a firearm, but at two different times. The first story alleged that Mr. Crotte began firing

8    upon exiting the house. See Exhibit 2 to the Note. The second story alleged that Mr. Crotte left

9    the house, waved a firearm, and allegedly fired after members of the mob angered him by breaking

10   windows of the house. See Petition.

11        Third, Mr. Martinez, who also made multiple statements, first claimed that when the mob

12   arrived at the location of the shooting, they did not see anybody and simply turned around to return

13   from whence they had come. See Petition. He later stated, however, that the mob encountered three

14   individuals and that the confrontation resulted in gunfire, which prompted the mob to retreat. Id.

15        Additionally, Mr. Martinez's initial statement is completely at odds with that of the other

16   mob members who gave statements. Mr. Martinez claimed the mob simply turned around upon not

17   finding anybody to confront. Id. Mr. Gonzalez, however, claimed the mob yelled and threatened

18   Mr. Crotte, who along with Rigoberto and David eventually appeared *before* the mob ever retreated.

19   See Exhibit 6, 12 to the Note. According to the Petition, Mr. Martinez also claimed that upon

20   arriving at the scene of events, he saw "three guys who were members fo the band LOS TEJONES

21   coming out of a house . . . ." See Petition. This version omits any claim of yelling at the house for

22   Mr. Crotte to come out and threatening him. Finally, unlike his fellow hooligans, Mr. Martinez

23   asserted that at least two separate instances of gunfire occurred. Id. The first occurred as they

24   neared the house and encountered the three men exiting. Id. The second occurred when they

25   returned to the house a second time. Id. The second round resulted in the gunshots to the victims.

26   Id. Finally, The Warrant indicates that Mr. Martinez stated he became wounded when "DAVID,

27   RIGOBERTO and ALDO came out, and when *they* were shooting he felt his right arm wounded,

28

1  as well as his chest underneath the left nipple . . . ." Warrant (emphasis added). This is contrary

2  to his claim that only Mr. Crotte possessed and used a firearm.[20]

3       These witnesses clearly have a motive to lie given their own criminal culpability. Witnesses

4  identified them as the aggressors. See Petition (61). Witnesses placed weapons, including several

5  firearms in the hands of members of the mob. See e.g., Exhibit 10 to the Note. Their own criminal

6  culpability accounts for the divergent explanations regarding the events among the mob's members.

7  It also explains why their statements are completely at odds with uninvolved, percipient witnesses

8  who lack motives to lie about what they saw occur.

9       Lastly, it must be noted that Mr. Martinez's statements, though recounted in the unsworn

10  Petition and Warrant, do not appear in any sworn, written Complaint. The same can be said of

11  Rogelio Rios Martinez, Magdalena Abundis Ortega, and Oscar Eduardo Sandoval Abundis. This

12  fact is crucial under Platko, which found such an omission to significantly undermine the

13  statement's reliability and evidentiary value. See Platko, 213 F.Supp.2d at 1238. The failure by the

14  prosecutor to swear out the Petition precludes his recitation from rescuing this deficiency. Id. at

15  1237 ("the sufficiency of hearsay statement to support a finding of extraditability appears to require

16  that the statements be vouched for in affidavits"); compare Emani v. U.S. Dist. Ct., 834 F2d 1444,

17  1450-51 (9th Cir. 1987) (because prosecutor's affidavit was authenticated and sworn by the

18  declarant, the hearsay statements summarized in it were admissible). If, as in Platko, authenticated

19  documents not themselves sworn failed to establish a foundation for the factual content asserted in

20  the government's papers, see Platko, 213 F.Supp.2d at 1238, the lack of *any* documents,

21  authenticated, sworn, signed or otherwise, cannot suffice to establish a foundation for the factual

22  content of the Petition in Mr. Crotte's case. This is especially so where several of these witnesses,

23  including Ms. Ortega and Mr. Abundis, failed to indicate they spoke from personal knowledge,

24  failed to identify the sources of information for the beliefs they formed: that Mr. Crotte was the

25

26  _____

27  [20] It is consistent with other statements indicating the mob went looking for more than just Mr. Crotte. Mr. Gonzalez stated the "were going to fight *some guys*," Exhibit 6 to the Note

28  (emphasis added) (23), and explained how the mob "yell[ed] at *them*" to come out and fight. Exhibit 12 to the Note (emphasis added) (49).

1   shooter responsible for the death and injury caused, and failed to identify the circumstances from

2   which either concluded that the sources were reliable and credible.  These omissions were fatal in

3   Platko and precluded a finding of probable cause.  See Platko, 213 F.Supp.2d at 1239 ("an affidavit

4   must contain factual support for the affiant's conclusions and either an assertion that the affiant

5   speaks from personal knowledge or a statement of the sources for the affiant's belief and the

6   circumstances from which the affiant concluded that the sources were reliable and credible").

7              **5.        Ballistics Evidence Excludes Mr. Crotte as the Shooter.**

8              Third, and more problematic for the government than the unreliability or inconsistencies

9   among witnesses' statements, is the ballistic evidence identified by the exhibits attached to the Note.

10  Ballistics reports of the bullet taken from the deceased also do not indicate the weapon used was

11  a handgun, e.g., a revolver, which is what witnesses alleged Mr. Crotte possessed.  See Exhibit 12

12  to the Note (48, 49).  Although the report did not determine the kind of gun it could have come

13  from, experts concluded that "the projectile corresponds to .22 caliber (Long-Rifle) lead-bullet."

14  Exhibit 8 to the Note.  On its face, it would seem that a "Long-Rifle" is not the same as a handgun.

15  Thus, it is unclear how the revolver allegedly used by Mr. Crotte could have fired the projectile that

16  caused the victim's death.

17             The Magistrate Court's analysis of this issue violated the precept that the only admissible

18  evidence beyond that presented in support of probable cause by the government is evidence that

19  explains away or completely obliterates probable cause.  The Magistrate Court went outside the

20  Note's record to extrinsic sources to create extra-record bases for assessing the existence of

21  probable cause.  In order to fit the square peg, e.g., a "Long-Rifle" lead-bullet, into a round hole,

22  e.g., a revolver, the court researched and used evidence derived from wikipedia.org, an online

23  source of information.  From the information derived at that website, the court concluded, in spite

24  of Jalisco's expert medical examiner's inability to determine what gun fired the bullet, cite, that

25  purportedly "various rifles, pistols, revolvers, and . . . shotguns' have been manufactured in the .22

26  Long Rifle caliber." Partial Certification Order at 37.  Thus, the Magistrate Court found, used and

27  relied upon extra-record evidence not contained in the Note in order to explain away Mr. Crotte's

28

1  claim that probable cause was lacking due to the "Long-Rifle" nature of the bullet.  This was

2  improper and exceeded the permissible scope of review for purposes of determining probable cause.

3         As problematically, the Magistrate Court chose to cull, quote and depend upon facts from

4  an unreliable and untrustworthy source.  Wikipedia.org is a "free content" online encyclopedia of

5  "articles."    When   one   goes   to   the   website's   main   page,   available   at

6  http://en.wikipedia.org/wiki/Main_Page, the first thing a viewer sees is the banner headline:

7                           Welcome to Wikipedia,

8                    the free encyclopedia that *anyone can edit.*

9  Id. (emphasis added).  As is evident, Wikipedia.org is not a reliable source of information and is

10 not trustworthy given the ability of anybody to edit and modify the website's content.

11 See http://en.wikipedia.org/wiki/Wikipedia:Introduction.    In fact, the website itself touts that

12 "[v]isitors   do   not   need   specialized   qualifications   to   contribute."

13 http://en.wikipedia.org/wiki/Wikipedia:About. Perhaps as a direct result, the site itself cautions that

14 in spite of some content policies and standards, articles can "contain significant misinformation,

15 unencyclopedic content, or vandalism." Id. A review of the Wikipedia website reveals a pervasive

16 and disturbing series of additional disclaimers, among them, that: (1) "Wikipedia may contain

17 unexpected oversights and omissions;" (2) "[a]llowing anyone to edit Wikipedia means that it is

18 more easily vandalized or susceptible to unchecked information;" (3) "articles are never complete;"

19 (4) "[u]sers should be aware that not all articles are of encyclopedic quality from the start, and may

20 contain false or debatable information;" (5) "articles contain statements and claims which have not

21 yet been fully cited" making it hard for the reader to judge the credibility of what is written; and (6)

22 "articles start their lives as partisan [drafts]" and "may for a while become caught up in a heavily

23 unbalanced viewpoint." Id. One news story about the site indicated that Wikipedia "co-founder

24 and überpedian Jimmy Wales has acknowledged there are real quality problems with the online

25 work," http://www.theregister.co.uk/2005/10/18/wikipedia_quality_problem/, while other news

26 stories   abound   with   discussions   of   errors   appearing   on   the   site.      See e.g.,

27 http://www.timesonline.co.uk/tol/news/uk/article730025.ece;

28 http://www.usatoday.com/news/opinion/editorials/2005-11-29-wikipedia-edit_x.htm;

1 http://www.news.com/Esquire-wikis-article-on-Wikipedia/2100-1038_3-5885171.html. Thus, even

2 assuming the Magistrate Court's outside the record reference was proper, it chose to rely upon a

3 poor and unpersuasive source of information to uphold a serious criminal charge with significant

4 potential penalties.

5       For all these reasons, the Court should not find that probable cause exists to justify

6 certification of Mr. Crotte for extradition.

7 **VI.**

8 **CONCLUSION**

9       For the foregoing reasons, Mr. Crotte respectfully prays that the Court grant the Writ of

10 Habeas Corpus and all other relief to which he may be entitled in this proceeding.

11 **VII.**

12 **VERIFICATION**

13       I, Jason I. Ser, hereby verify that the facts contained in the instant petition are true and

14 correct to the best of my knowledge and that I am authorized by Mr. Crotte to file the instant

15 petition on his behalf.

16       Respectfully Submitted

17

18 Dated:  May 6, 2008

19       JASON I. SER
      Federal Defenders of San Diego, Inc.
      Attorneys for Mr. Crotte

20

21

22

23

24

25

26

27

28