# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALDO OMAR CROTTE SAINEZ,<br><br>　　　　　　Petitioner,<br>　vs.<br>STEVE SAFFORD, Acting United States Marshal for the Southern District of California,<br><br>　　　　　　Respondent. | CASE NO. 08-CV-0819-H (AJB)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |

On May 6, 2008, petitioner Aldo Omar Crotte Sainez ("Petitioner") filed a petition for the writ of habeas corpus, pursuant to 28 U.S.C. § 2241, that challenges his detention by the United States Marshals Service pursuant to a magistrate judge's order granting a certificate of extraditability.[1] (Doc. No. 1.) On July 2, 2008, the government filed a response in opposition. (Doc. No. 8.) On July 18, 2008, Petitioner filed a reply. (Doc. No. 9.) The Court concludes that this matter is suitable for decision without oral argument and submits it on the papers in accordance with Local Civil Rule 7.1(d)(1). For the reasons discussed below, the Court denies the petition.

/ / /

/ / /

---

[1] The government's brief characterized this as a petition under 28 U.S.C. § 2255, though there is no dispute over whether the Court may entertain the petition. The distinction is not essential to the Court's ruling, though it appears that section 2241 is the proper statutory basis for this petition. See Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008).

**Background**

**I.   Procedural Overview**

On November 5, 1999, the Criminal Court of the First Judicial District in Puente Grande, State of Jalisco, Mexico, issued an arrest warrant for offenses allegedly committed by Petitioner on June 26, 1999. In December 2006, U.S. Immigration and Customs Enforcement officials arrested petitioner at the San Ysidro Port of Entry. On March 23, 2007, under the Extradition Treaty Between the United States of America and the United Mexican States, May 4, 1978, 31 U.S.T. 5059 ("Treaty"), Mexico requested Petitioner's extradition by submitting Diplomatic Note No. 2187 to the Secretary of State of the United States. Mexico sought to extradite Petitioner to answer charges of (1) Simple Intentional Homicide ("homicide") and (2) Battery/Bodily Injuries ("battery").

In support of Mexico's request, the United States Attorney for the Southern District of California filed an extradition complaint against Petitioner on January 24, 2007. (Case No. 07-MJ-0177.) The magistrate judge held an extradition hearing on September 26, 2007, and on February 8, 2008, the magistrate judge certified the extradition request on the homicide charge but not the battery charge. On February 8, 2008, the magistrate judge also stayed extradition pending habeas review by the district court. The Government of Mexico agrees that the statute of limitations has expired on the battery charge. (See Resp't's Resp. Opp'n Ex 3.)

Petitioner raises several arguments to challenge his detention following the magistrate judge's certification order: (1) there is insufficient evidence to support extradition; (2) extradition is not proper since the United States statute of limitations has expired for the homicide charge; (3) partial certification is inconsistent with the Treaty; (4) the doctrine of speciality precludes extradition unless Mexico guarantees that it will not prosecute other charges.

Mexico requests Petitioner's extradition for the killing of Daniel Sandoval Abundis ("Sandoval") on June 26, 1999. Along with its Diplomatic Note requesting extradition, Mexico submitted seventeen pieces of documentary evidence, certified and

authenticated as admissible under Mexican law by David T. Donahue, Minister Counselor for Consular Affairs. These documents include: (1) statements by the Public Prosecutor; (2) various witness statements regarding the alleged shooting; (3) Sandoval's death record, autopsy report, and photographs of the body; (4) the request for issuance of an arrest warrant, including a summary of the Public Prosecutor's findings; (5) the resulting arrest warrant and writ certifying its validity; (6) excepts from the Jalisco penal code; and (7) a witness statement identifying Petitioner.

## II.    Supporting Allegations

The extradition request alleges that Petitioner shot and killed Sandoval in the course of a dispute on the evening of June 26, 1999. That night, Sandoval, Julio Cesar Sevillano Gonzalez ("Sevillano"), and others set out to confront a group, including Petitioner, known as Los Tejones. When Sandoval and company arrived outside the house where they believed Los Tejones to be, Sandoval's group began shouting vulgar threats and throwing rocks at the house and Petitioner's car. Petitioner, and possibly others, emerged from the house or Petitioner's car. As alleged, Petitioner produced his revolver and fired into Sandoval's group multiple times. Gunfire killed Sandoval and injured Sevillano. (See also Order Granting Part Denying Part Request Extradition, 07-MJ-0177, Doc. No. 30 ("Extradition Order") at 25-32 (summarizing the homicide evidence).)

### A.    Sevillano's Statements

The magistrate judge concluded that "Sevillano's statements demonstrate probable cause that [Petitioner] committed the homicide of Sandoval." (Extradition Order at 32.) Sevillano provided two statements. He made the first on June 27, 1999 at 1:30 a.m., a few hours after the incident, and the second on September 2, 1999. In his first statement, Sevillano identified Petitioner as the shooter:

> [W]hen we arrived to that house we yelled at them "come out bastards," and in that moment the two brothers Rigo and David came out, as well as Aldo Omar Crote [Petitioner], and I saw he was holding a gun with his hand, and shoot at Daniel and me, who were walking ahead, as well as at the rest of my friends, and suddenly I felt my right hand wounded, and the

> left side of my chest was hurting bad, so we ran around the corner and my friend Cain Juan and Juanito Alcala arrived in a car which I boarded so they brought me to [a medical center] . . . .

(Diplomatic Note Ex. 6.)  His second statement also identified Petitioner:

> [W]hen El Dany [Sandoval] and I were outside the brothers' house in which Aldo [Petitioner] also lives, we started to yell at them "come out assholes to kick your ass" we did it several times so Aldo went out holding the same weapon that he had used to shoot at us previously as I stated before.  When Aldo went out he ran towards us aiming his gun at us, so Dany and me were going back, it was at that moment that he started shooting at us as the brothers David and Rigoberto were going out too. When Aldo was shooting us I felt my right hand injured and at the same time I felt my chest right under my left nipple injured too, I felt that I was wounded and fell to the ground as I was going back, since Aldo was shooting us as we were retreating.  When I was on the ground I didn't see where my friend Dany had gone because I was a bit unconscious and dizzy, but I felt that I was being dragged by my shoulders, I got better after a while and then I noticed that my friends were carrying my friend Dany and left him laying on his back, so I went towards Dany and noticed that there was a hole on his shirt around the left part of his chest . . . .

(Diplomatic Note Ex. 12.)

### B. Forensic Evidence

Mexican authorities conducted an autopsy which indicated that a bullet had entered and exited Sandoval's left arm and reentered his front left chest at the height of the nipple.  (See Diplomatic Note Exs. 8-9.)  Ballistics experts concluded that "the projectile corresponds to a .22 caliber (Long-Rifle) lead-bullet."  (Diplomatic Note Ex. 13.)  The Public Prosecutor also observed bullet damage to surrounding buildings. (Diplomatic Note Ex. 3.)

### C. Other Statements

Jose Antonio Nava Valadez ("Nava Valadez"), part of the group with Sandoval and Sevillano, gave a statement a few hours after the incident on June 26, 1999, at 11:30 p.m.  (Diplomatic Note Ex. 2.)  He saw an individual who emerged from the house and fired several times into the group.  (Id.)  He described the shooter as short with a Van Dyke beard.  (Id.)  Carlos Crotte Guevara, Petitioner's father, provided a statement describing Petitioner as 1.65 meters tall with a Van Dyke beard.  (Diplomatic Note Ex. 11.)

Friends of Petitioner provided a different version of events. In their version, Petitioner fled from his car into the house, rather than emerging from the house to shoot. Maria Luisa Cuevas Dueñas ("Cuevas Dueñas"), a friend of Petitioner who owned the home where he was staying, witnessed the confrontation while returning home. (Diplomatic Note Ex. 5.) She gave a statement on July 14, 1999, a few weeks after the incident. (Id.) She saw a "group of more than ten or fifteen boys, who were holding rocks in their hands, and two of them were holding guns . . . ." (Id.) They approached her house shouting vulgar death threats, and threw rocks at the house and Petitioner's car. (Id.) Petitioner emerged from his car and ran towards the house. (Id.) She then heard a sound like corn popping. Her signed statement does not indicate whether she saw a shooter. The Public Prosecutor states that he interviewed Cuevas Dueñas on the night of the incident, where she stated that Petitioner took out a gun and shot at the group threatening the house and his car. (Diplomatic Note Ex. 3.)

Cuevas Dueñas's husband, Salvador Gonzalez Gonzalez, provided his version of events in a statement of July 14, 1999. He was inside the house in bed when falling glass alerted him. (Diplomatic Note Ex. 10.) He looked out a window and saw about fifteen boys, including some armed with guns. (Id.) While inside the house, he also heard a noise "like corn popping" before Petitioner ran into the house. (Id.) He claimed to have taken photos showing damage to the front of his house caused by gunfire. (Id.)

The Public Prosecutor's petition summarized statements by Carmen Becerra Guerrero and Vicente Gonzalez Cuevas. Both indicated that members of the crowd outside the house had guns, without identifying a particular shooter. (See Diplomatic Note Ex. 13.)

///
///
///
///
///

## Discussion

### I. Standards of Review

Review of the decision to certify an individual as extraditable is available only via a petition for the writ of habeas corpus. Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Caplan v Vokes, 649 F.2d 1336, 1340 (9th Cir. 1981). "The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate." Vo v. Benov, 447 F.3d 1235, 1240 (9th Cir. 2006); see also Manta, 518 F.3d at 1140. The habeas court reviews purely legal questions de novo and reviews purely factual questions for clear error. See Quinn v. Robinson, 783 F.2d 776, 791 (9th Cir. 1986) The habeas court reviews mixed questions de novo. See Vo, 447 F.3d at 1240.

### II. Probable Cause

#### A. Standard of Review

Petitioner claims that the record lacks evidence to support the magistrate judge's determination of probable cause supporting extradition. The probable cause determination "serves only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." Caplan v. Vokes, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981). "Because the magistrate's probable cause determination is thus not a finding of fact 'in the sense that the court has weighed the evidence and resolved the disputed factual issues,' . . . it must be upheld if there is any competent evidence in the record to support it." Quinn, 783 F.2d at 791 (quoting Caplan, 649 F.2d at 1342 n.10). "Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict." Fernandez v. Phillips, 268 U.S. 311, 312 (1925).

/ / /

/ / /

**B.    Admissibility of Evidence**

The admissibility of evidence in extradition matters is controlled by 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

"[A]uthentication is the only requirement for admissibility of evidence under general United States extradition law." Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988). All of the documentary evidence submitted by Mexico was authenticated as admissible under Mexican law and therefore properly considered in the extradition proceedings.

**C.    Sufficiency of the Evidence**

There was competent evidence to support the magistrate judge's determination of probable cause supporting extradition. In two separate statements, Sevillano identified Petitioner as shooting towards Sandoval's group. (Diplomatic Note Exs. 6, 12.) Nava Valadez also identified a shooter fitting Petitioner's description. (Diplomatic Note Ex. 2.) These eyewitness accounts provide competent evidence sufficient to support the court's determination of probable cause.

Petitioner counters with various theories going to the weight of the evidence, including: (1) evidence that other members of Los Tejones may have fired into the crowd containing Sevillano and Sandoval, (2) evidence of other firearms used by the crowd, (3) the fact that other witnesses do not state that they saw Petitioner firing a gun, and (4) inconsistencies between the witness statements. Petitioner's arguments do not undermine the magistrate judge's finding of probable cause, but simply go to the weight of the evidence. "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn, 783 F.2d

at 815. On this record, there is probable cause to believe that Petitioner committed the charged offense. See Fernandez, 268 U.S. at 312 ("Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict.") The extradition process requires Petitioner to submit to the judicial process of the requesting country where he may challenge the sufficiency of the evidence and raise any defenses available under the law. See Grin, 187 U.S. at 184-85.[2]

### III. Statute of Limitations

The Treaty provides the following standards regarding "Lapse of Time:"

> Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested Party.

Treaty art. 7. Therefore, extradition is inappropriate if the homicide charge is barred by the statute of limitations of either Mexico or the United States. Petitioner conceded at his extradition hearing that the statute of limitations for the homicide charge has not run under Mexican law, so the Court only considers whether the statute of limitations has run under United States law. (Sept. 26, 2007, Hearing Tr. 2:21-3:3.)

#### A. Applicable United States Statue of Limitations

The order certifying extradition notes that the statute of limitations most analogous to the charged Mexican offense of simple homicide is 18 U.S.C. § 3282(a), which provides:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

(See Extradition Order at 14-15.) The magistrate judge properly concluded that Title 18

---

[2] As the record included other competent evidence to support the magistrate judge's determination of probable cause, the Court need not reach Petitioner's claim concerning the ballistics evidence. In any event, the ballistics evidence was inconclusive regarding the type of firearm. (See Diplomatic Note Ex. 13.)

U.S.C. § 3282(a) provides the applicable statute of limitations.[3]

The applicable limitation turns on whether the charged Mexican offense of simple homicide is comparable to first degree murder or second degree murder and manslaughter. The United States has no statute of limitations for first degree murder, 18 U.S.C. §§ 1111, 3281, and a five-year statute of limitations for second degree murder and manslaughter, 18 U.S.C. §§ 1111-12, 3282(a). Since there is no United States statute of limitations, extradition for first degree murder would not be barred by the lapse of time. See In re Extradition of Kraiselburd, 786 F.2d 1395, 1397-98 (9th Cir. 1986). The Ninth Circuit has examined the Mexican simple homicide offense, however, and concluded that it is comparable to second degree murder or voluntary manslaughter. See Kleeman v. United States Parole Comm'n, 125 F.3d 725, 732 (9th Cir. 1997) ("One convicted of 'homicidio simple' may have committed an act that we would treat as murder in the second degree or only as voluntary manslaughter."). Therefore, whether or not the charged offense is more analogous to second degree murder or voluntary manslaughter, the five year limit applies.

### B. Tolling of the Statute of Limitations

The government argues that the Mexican arrest warrant issued on November 5, 1999, tolled the statute of limitations. Petitioner argues that Title 18 U.S.C. § 3282(a) requires an "information" or "indictment" to toll the statute of limitations, and since neither document exists in the Mexican legal system, the statute of limitations was not tolled.

To resolve this issue, the Court looks to the Restatement (Third) of Foreign Relations Law, which states that "[f]or purposes of applying statutes of limitations to requests for extradition . . . the period is generally calculated from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step

---

[3] In the extradition proceedings, the government also argued that any statute of limitations should be tolled because Petitioner was fleeing from justice within the meaning of 18 U.S.C. § 3290. The magistrate judge concluded that the government failed to support this argument, and the government has not renewed it here. (See Extradition Order at 18 n.11.)

in the requesting states, or of the filing of the request for extradition, whichever occurs first." Restatement (Third) of Foreign Relations Law § 476, cmt. e (1987). Consistent with this approach, the Ninth Circuit has used an arrest warrant to measure the statute of limitations for extradition from the United Kingdom. See Caplan v. Vokes, 649 F.2d 1336, 1340 (9th Cir. 1981). Additionally, courts should exercise good faith toward foreign powers when construing our extradition treaty obligations. See Grin v. Shine, 187 U.S. 181, 184 (1902). The Ninth Circuit has stated that "it would be inappropriate to engage in . . . an inquiry into the formal procedure a country uses in instituting prosecution." Theron v. United States Marshal, 832 F.2d 492, 499-500 (9th Cir. 1987), abrogated on other grounds, United States v. Wells, 519 U.S. 482 (1997).

Mexico initiated a criminal proceeding through its warrant process, which required a judge to review and approve the petition describing the alleged conduct. (See Diplomatic Note Exs. 13-14.) The reviewing judge issued the warrant for intentional simple homicide, but not the aggravated homicide charge requested by the Public Prosecutor. (See Diplomatic Note Ex. 14.) The warrant was sufficient to toll the statute of limitations for purposes of extradition. Accordingly, the Court concludes that the United States statute of limitations does not bar extradition on the homicide charge.

**IV.   Article 14 and Partial Certification**

Petitioner argues that Article 14 of the Treaty precludes extradition unless the court certifies all charges. The Court disagrees. Article 14 provides, in part:

> 1. The requested Party shall promptly communicate to the requesting Party its decision on the request for extradition.
>
> 2. In the case of complete or partial rejection of a request for extradition, the requested Party shall give the reasons on which it was based.
>
> 3. If the extradition is granted, the surrender of the person sought shall take place within such time as may be prescribed by the laws of the requested Party. The competent authorities of the Contracting Parties shall agree on the date and place of the surrender of the person sought.

Petitioner contends that since section 2 refers to "partial rejection" while section 3 does not, section 3 must contemplate surrender only when extradition is granted for

all requested offenses. Courts should liberally construe extradition treaties to effect their purpose. See Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 10 (1936). Under this standard, the Court reads the phrase "[i]f extradition is granted" in section 3 as applying to any certification, complete or partial. Petitioner's interpretation would defy the principle of liberal construction described in Valentine and impose a heavy burden on extradition requests. Therefore, the Court concludes that Article 14 does not prevent extradition based on a partial certification.

**V.    Rule of Speciality**

Since the United States did not certify the battery charge, Petitioner argues that extradition requires a guarantee that Mexico will not prosecute him on the time-barred offense. Extradition treaties commonly require the requesting nation to refrain from prosecuting offenses for which the extraditing nation did not grant certification. See, e.g., United States v. Rauscher 119 U.S. 407, 420-21 (1886); Treaty art. 17. Article 17, entitled "Rule of Speciality," embodies this approach. It requires that the extradited person "not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted . . ." unless certain exceptions apply. Petitioner cites no authority requiring the requesting country to provide an additional guarantee when the United States grants partial certification. Treaty art. 17.  The Court sees no reason to require Mexico to reiterate its existing obligations under the Treaty.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Conclusion**

For the reasons stated above, the Court DENIES the petition for the writ of habeas corpus. The magistrate judge's stay was effective until the conclusion of the district court's review. (See Order Granting Motion Seeking Stay of Certification, Case No. 07-MJ-0177, Doc. No. 32.) The Court declines to issue a further stay of the certification of extradition.

IT IS SO ORDERED.

DATED: August 25, 2008

                                                    MARILYN L. HUFF, District Judge
                                                    UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record